23

RECEIPT NUMBER

53 4123

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALBERT STEIN, <br><br> Plaintiff, <br><br> v. <br><br> ERSKINE B. BOWLES, ELLEN J. KULLMAN, KENT KRESA, G. RICHARD WAGONER JR., PHILIP A. LASKAWY, ARMANDO M. CODINA, E. STANLEY O'NEAL, KAREN L. KATEN, GEORGE M.C. FISHER, PERCY N. BARNEVIK, ECKHARD PFEIFFER, AND JOHN H. BRYAN, <br><br> Defendants, <br><br> and <br><br> GENERAL MOTORS CORPORATION, <br><br> Nominal Defendant. | JUDGE : Cook, Julian Abele, Jr. <br> DECK  : S. Division Civil Deck <br> DATE  : 11/10/2005 @ 16:44:00 <br> CASE NUMBER : 2:05CV74334 <br> CMP ALBERT STEIN V. ERSKINE B. BOWLES, TAM <br><br> MAGISTRATE JUDGE R. STEVEN WHALEN <br><br> **STOCKHOLDERS'** <br> **DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff, by and through his attorneys, derivatively on behalf of General Motors Corporation ("GM" or the "Company"), allege upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding the issues detailed below on behalf of nominal defendant GM alleges the following.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and 1391(b) because Nominal Defendant GM is headquartered in this District, substantially all of the defendants either reside or conduct business in this District and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

3.     While GM is incorporated in Delaware, it is headquartered in Michigan, where the center of its worldwide operations are located and managed.  The GM executives named as defendants were, for the most part, located in Michigan, and the alleged wrongdoing occurred at GM's headquarters in Michigan, where the bulk of the evidence and civil witnesses relevant to this case are located.  GM has virtually no operation or employees in Delaware, no significant part of the wrongdoing occurred there, no witnesses reside there and no known documentary evidence is located there.  Not all defendants named herein are subject to personal jurisdiction in Delaware and a jury trial on these claims is not available under Delaware law or in its Chancery Court.  Finally, there are several suits already pending in this District in which GM and some or most of the individual defendants in this action are named as defendants, and, thus, discovery and pretrial proceedings can be coordinated.

## THE PARTIES

### The Plaintiff

4.      Plaintiff Albert Stein has owned at all times relevant to this action, and continues to own, GM common stock.

5.      Plaintiff, as a current holder of GM common stock, and a holder continuously during the period of the wrongs alleged herein, has standing to assert these claims on behalf of GM and will fairly and adequately protect the interests of GM and its other stockholders.

### The Nominal Defendant

6.      Nominal Defendant GM is incorporated in the state of Delaware and maintains its executive offices at 300 Renaissance Center, Detroit, Michigan. GM common stock trades on the New York Stock Exchange under the ticker symbol "GM".

### The Defendants

7.      Defendant Percy N. Barnevik has been on the Board of GM since 1996.  He was until recently the Chairman of AstraZeneca PLC, United Kingdom.  He has also the former Chairman and Honorary Chairman of Sandvik AB, Sweden; former Chairman, Investor AB, Sweden; and  Chairman, ABB Ltd., Switzerland. He serves on the GM Board as the Chair of the Public Policy Committee, and as a member of the Directors and Corporate Governance Committee.  In addition, he is a member of The Business Council, the International Investment Council advising the South African government, the International Advisory Council of the Federation of Korean Industries, the Advisory Council of Centre for European Reform-UK, Advisory Councils at the Wharton School of Business Administration and at Humboldt University in Berlin, and the Academies of Engineering Sciences in Sweden and Finland; Honorary Member of the American Academy of Arts and Sciences and Honorary Fellow of the Royal Academy of Engineering, UK.

8.      Defendant Erskine B. Bowles was elected to the GM board in 2005. He was the Chief of Staff to former U.S. President William J. Clinton. He is the Chairman of Erskine Bowles & Co., LLC since 2003; Senior Advisor, Carousel Capital, a private investment firm, since 2002; Managing Director, Carousel Capital, and was a Partner at Forstmann Little & Co. from 1999 to 2001. He also serves on the Board of Cousins Properties Incorporated, and is a member of the Board of Chancellors, Juvenile Diabetes Research Foundation International; and a Deputy Special Envoy for the Tsunami Recovery, United Nations.

9.      Defendant John H. Bryan has served on the GM Board since 1993. He is the retired Chairman and Chief Executive Officer of the Sara Lee Corporation, Chicago, Illinois. On the GM Board, he serves as the Chair of the Executive Compensation Committee, and a member of the Directors and Corporate Governance Committee. He is also a director of BP p.l.c.; and of Goldman Sachs Group, Inc. Mr. Bryan serves as a member of The Business Council and the National Trust Council of the National Trust for Historic Preservation; as a Trustee of the University of Chicago and Life Trustee of Rush-Presbyterian-St. Luke's Medical Center; as Chairman of the Board of Trustees of The Art Institute of Chicago and Chairman of the Board of Millennium Park, Inc.

10.      Defendant Armando M. Codina has been a director of GM since 2002. He is the Chairman and Chief Executive Officer of the Codina Group, Inc., a full-service commercial real estate firm based in Coral Gables, Florida, since 1979. On the GM Board, he serves as a member of the Investment Funds and Public Policy committees. He is also a director of AMR Corporation and of BellSouth Corporation, and serves as Chairman Emeritus of the Board of Trustees of Florida International University.

419870                                            4

11.     Defendant George M.C. Fisher has served on the GM Board since 1996. He is the retired Chairman and Chief Executive Officer, Eastman Kodak Company, Rochester, New York. He serves as the Chair of the Directors and Corporate Governance Committee, and as a member of the Executive Compensation Committee. He is the Chairman of PanAmSat Corporation; and serves on the Board of Eli Lilly and Company, and is a member of The Business Council, the International Academy of Astronautics and the National Academy of Engineering. He is a Senior Advisor for Kohlberg Kravis Roberts & Co. and a Fellow of the American Academy of Arts and Sciences.

12.     Defendant Karen L. Katen has been on the GM Board since 1997. She is the Vice Chairman of Pfizer Inc, New York, New York, and President of Pfizer Human Health, since March 2005, and previously held various positions within Pfizer. On the GM Board, she sits on the Directors and Corporate Governance Committee and on the Executive Compensation Committee. She is also on the Board of Harris Corporation, and a Member of the Boards of Directors of Catalyst, the Pharmaceutical Research and Manufacturers of America (PhRMA), and the National Alliance for Hispanic Health, the RAND Corporation's Health Board of Advisors, the National Board of Trustees for the American Cancer Society Research Foundation, the Healthcare Leadership Council, and the Economic Club of New York's Board of Trustees. She is a Trustee for the University of Chicago and Council Member of the Graduate School of Business, and an appointee to the National Infrastructure Advisory Committee.

13.     Defendant Kent Kresa has been a Director of GM since 2003. He is the Chairman Emeritus, Northrop Grumman Corporation, and previously was the Chairman and Chief Executive Officer of Northrop Grumman. On the GM Board, he serves on the Audit Committee and on the Investment Funds Committee. He is also a director of Avery Dennison Corporation,

Fluor Corporation, and MannKind Corporation. He is the Chairman of the Board of Trustees of California Institute of Technology; a member of the Boards of Directors of the W.M. Keck Foundation, The Broad Foundation, and Performing Arts Center of Los Angeles County, the Board of Overseers of the Keck School of Medicine of the University of Southern California, the Board of Visitors of the UCLA Anderson School of Management, the Advisory Board of the Massachusetts Institute of Technology Lincoln Laboratory, and the Board of Trustees of the Haynes Foundation.

14.     Defendant Ellen J. Kullman has been a director of GM since 2004. She is the Group Vice President for Safety and Protection, E.I. du Pont de Nemours and Company, Wilmington, Delaware. On the GM Board, she serves on the Investment Funds Committee and on the Public Policy Committee. She is also on the Board of Overseers at Tufts University School of Engineering and the Board of Directors of the National Safety Council.

15.     Defendant Philip A. Laskawy has been on the Board of GM since 2003. He is the retired Chairman and Chief Executive Officer, Ernst & Young. He serves as the Chair of the Audit Committee, and on the Investment Funds Committee. He also serves on the Board of Henry Schein, Inc., Loews Corporation, and The Progressive Corporation. He is a Trustee of the International Accounting Standards Committee Foundation.

16.     Defendant E. Stanley O'Neal has been a member of the GM Board since 2001. He is the Chairman of Merrill Lynch & Co., Inc., since 2003. On the GM Board, he serves as the Chair of the Investment Funds Committee, and as a member of the Public Policy Committee. He is also member of The Business Roundtable, the Council on Foreign Relations, the Boards of Directors of Memorial Sloan-Kettering Cancer Center, the Center for Strategic and International Studies (CSIS), and The Lincoln Center Theater.

17.     Defendant Eckhard Pfeiffer joined the GM Board in 1996.  He is the retired President and Chief Executive Officer of Compaq Computer Corporation.  He serves on the Audit and Investment Funds Committees.  He is also the Chairman of Intershop Communications AG; and a member of the Boards of IFCO Systems, N.V.; Telefonaktiebolaget LM Ericsson.  He serves on the Advisory Board of Deutsche Bank.

18.     Defendant G. Richard Wagoner, Jr. is the Chairman and Chief Executive Officer of General Motors Corporation since May 1, 2003.  He held the offices of President and Chief Executive Officer (2000-2003), President and Chief Operating Officer (1998-2000).  He joined General Motors Corporation in 1977, and has served on the Board of Directors since 1998.  He is also on the Board of General Motors Acceptance Corporation, a subsidiary of GM.  Mr. Wagoner is a member of The Business Council and The Business Roundtable, the Board of Directors of Catalyst, and the Boards of Trustees of Duke University and Detroit Country Day School; and is the Chairman of the Detroit Renaissance Executive Committee.

## OBLIGATIONS OF DIRECTOR AND OFFICER DEFENDANTS

19.     Each of the defendants owed to GM the duty of loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts related thereto.  Further, the defendants owed a duty to GM to ensure that GM operated in compliance with all applicable federal and state laws, rules, and regulations; and that GM did not engage in any unsafe, unsound, or illegal business practices.

20.     To discharge these duties, the defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of GM.  By virtue of their obligations to carry out their duties with the utmost loyalty, good faith, due care and diligence, defendants were required, among other things, to:

a. manage, conduct, supervise, and direct the employees, businesses and affairs of the Company in accordance with all applicable laws, rules and regulations, and the Company's charter and by-laws;

b. neither violate nor knowingly or recklessly permit any officer, director or employee of the Company to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees;

c. ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by the Company;

d. remain informed as to how the Company, in fact, was operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

e. supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by the Company and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

f. preserve and enhance the Company's reputation as befits a public corporation and to maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

## SUBSTANTIVE ALLEGATIONS

21.     GM is a beleaguered company that has seen its market penetration, credit rating, reputation, and market capitalization fall to unprecedented low levels. What was once the most revered organization in America has begun to implode under the weight of these maladies coupled with crippling pension benefit liabilities and an inability to raise capital at competitive rates.

22.     Despite a concerted effort to present the Company in the most favorable light possible in the face of four straight quarterly losses – the Company's longest stretch without a profit in thirteen years - GM must now disclose the realities of its deteriorating business model

419870                                              8

and that its management and board of directors failed to exercise the requisite level of care required of a board charged with the stewardship of such an important entity.

23.   GM's Board's failure to exercise the requisite level of care mandated under these circumstances has finally come to light.  Indeed, the Board has sat supinely while chief executive officer Rick Wagoner continued to employ failed policies and has now exposed the Company to massive liability and SEC investigations.   On November 9, 2005, GM, whose accounting is under scrutiny by the Securities and Exchange Commission, said it must restate financial results for 2001 and possibly subsequent years, the latest blow to the beleaguered auto giant.

24.   GM stated it overstated income for 2001 by as much as $300 million to $400 million - equivalent to about 50% of the profit it reported at the time - by "erroneously" booking credits from suppliers. The Company said its accounting for credits from suppliers is "one of the matters" being investigated by the SEC.

25.   GM's admission ended a day in which its shares fell to their lowest level since November 1992 - during the Company's last financial and management crisis - in 4 p.m. NYSE trading, closing down $1.23, or nearly 5%, at $24.63. Also, yesterday, Fitch Ratings cut its already junk-level rating on GM's debt by another two notches from BB+ to BBB.

26.   According to *Bloomberg* news, the restatement concerns GM's previously reported 2001 net income of $601 million. According to GM as reported over *Bloomberg*, when GM finalizes its restatement for the period, in its annual report for 2005, the restatement will purportedly total $300-$400 million.  This would reduce the 2001 earnings to between $201 and $301 million.  The restated 2001 credits were supposedly for savings GM would receive from suppliers, spokeswoman Toni Simonetti told *Bloomberg* reporters. These credits should have been booked in subsequent years, she said, but instead GM booked them in 2001.

419870                                                      9

27.    According to GM spokeswoman Gina Proia, the credits came from "several of our suppliers," but she declined to identify them to reporters.  In light of recent SEC enquiries into the financial reporting of the much maligned Delphi Corp., including its transactions with GM, and Delphi's long-standing role as among GM's largest suppliers, it appears likely that the restated credits involve some Delphi transactions.  Joseph Amaturo, an analyst at Calyon Securities USA Inc., told the press that "[t]hey booked credits from multiple suppliers, with cash tied to future business . . .They made a mistake. They booked all the credits when they received them instead of over the product lifecycle."

28.    GM's troubles reach beyond the recent restatement and its Board has sat idly by as they exponentially increased.  Delphi Corp., a former unit of GM, filed for bankruptcy protection last month, six years after being spun off from the automaker.  Delphi, the largest U.S. auto-parts maker, in March said it inflated earnings and cash flow after finding that rebates booked as one lump payment from suppliers should have been spread over several years.  The company in June reduced its 2001 retained earnings by $265 million after a probe of its internal accounting. The SEC has been investigating the Troy, Michigan-based company for much of this year, and the restatements cost the chief financial officer and four other executives their jobs.

29.    The internal audit focused on how Delphi booked rebates from suppliers. It also probed accounting for $237 million in cash payments made to GM. Delphi made the payments to get a release from warranty claims and health-care obligations and $85 million in credits it received from GM.

30.    Delphi also stated in March that it had inflated earnings and cash flow after finding that rebates booked as one lump payment from suppliers should have been spread over several years.

31.     General Motors in April said it properly accounted for transactions with Delphi but the investigation is ongoing.

32.     In October, GM said it was revising second-quarter results to reflect a change in the value of its 20% ownership in Fuji Heavy Industries, which it has since sold.   On October 5 of this year, Toyota bought all 68 million shares that GM held in Fuji Heavy for just $315 million.

33.     In its Second Quarter, 2005 results, GM had reported the value of its Fuji Heavy stake (which includes the Subaru brand of cars) at $1.5 billion.  GM has now adjusted that value downward to only $650 million.  As a result, GM's net loss for that quarter has approximately quadrupled from $286 million to $1.07 billion. GM's net loss per share for the period was $1.90, compared with a loss of 51 cents in its initial earnings report. So far this year, GM's losses total $3.81 billion.

34.     GM last month said the SEC had issued subpoenas involving financial reporting of pension and other retiree benefit programs; transactions between the automaker and Delphi; possible obligations to fund Delphi's pensions; and recovery of recall costs from suppliers and supplier price reductions and credits.

35.     Watson Wyatt & Co., a Washington-based human-resources consulting firm, said in a separate filing yesterday that the SEC also issued it a subpoena for both documents and testimony related to the investigation of GM pensions and benefits. Watson Wyatt, GM's actuary, said it provided documents to the SEC.

36.     Wall Street analysts have lost faith in Mr. Wagoner and the Company's overall leadership.  For example, Bank America analyst Ron Tadross said GM's management may be changed – including Mr. Wagoner – and that there was a 40% possibility that GM will file for

Bankruptcy in the next two years.  Specifically, Mr. Tadross told *Bloomberg News* that "we believe the odds that GM management could be held accountable for accounting errors has gone up, and this could accelerate bankruptcy protection decision that we think is inevitable."  Indeed, fears of GM defaulting on its debt are evidenced by a recent $60,000 spike in GM's credit-default swap on November 9, 2005 to a five month high of about $1 million to insure $10 million of debt, according to J.P. Morgan Chase & Co. default swaps also spiked on General Motors Acceptance Corp.  In a credit-default swap, the buyer pays an annual fee and obtains a right to be paid the face value of the debt it buys (in this case GM's debt) should the issuer default.  Simply stated, swap prices typically decline when credit worthiness improves, and rise when it worsens. Here, institutional investors who hold millions in GM debt are seriously concerned that default is plausible and, as a result, efforts to hedge are becoming more expensive.

37.     As *The Wall Street Journal* recently explained in an October 24, 2005 commentary by John Schnapp, "GM is an organically sick enterprise, one that has been in decline for more than three decades, and one that has never seriously come to grips with itself." Commenting on the deterioration of the core business, Mr. Schanpp noted "[e]ven the heavily highlighted legacy-cost burden would be much more bearable if the core business, selling vehicles in North America, were heading north instead of drifting steadily south. The company is certainly a victim of its history -- but the legacy costs grabbing center-stage are far from GM's only self-inflicted problems. There are others."

38.     As discussed by Mr. Schnapp and further evidenced by an analysis of the Company's business practices, GM suffers from inadequate corporate governance. "A company like GM badly needs a board with at least a core group of directors able to advise and evaluate management from their own successful turnaround experiences."

39.    Mr. Schnapp outlined GM's board's core deficiencies:

The central GM directors have not [provided the requisite guidance and care]. George Fisher, the chief executive's main confidante, left Eastman Kodak after having been unable to halt its downward spiral. Eckhard Pfeiffer drove Compaq into a ditch. Percy Barnevik virtually destroyed engineering giant ABB and tried to flit away with an $88 million pension. Karen Katen is a vice-chairman of Pfizer, whose share price collapse has paralleled GM's, and for many of the same reasons. The only GM director who had reinvigorated a sickly company, A.G. Lafley of Proctor & Gamble, quietly withdrew from its board in April. The board, quite simply, is the wrong kind of board for a company facing GM's needs.

40.    Mr. Schnapp also severely scolded GM's senior management for living under the shroud of a culture of non-accountability:

GM chronically sets objectives and fails to achieve them. Then nothing happens. The recent list is extensive: 29% U.S. market share, 5% net return on sales, earnings per share of $10, Chevrolet sales volume of three million vehicles. The corporate culture either moves the goalposts on the timing attached to each objective, sometimes to an indeterminate future; retroactively downplays its importance; or mends the problem with amnesia. GM has long been a bastion of non-accountability. Executives who have said grace over declining venues have chronically been promoted into more important ones. It should be a public embarrassment to GM's Board that the CEO has been at the helm for longer than Carlos Ghosn took to convert equally sickly Nissan into one of the most profitable automakers. It doesn't seem to be.

41.    Finally, Mr. Schanpp states that GM's present management and Board are unable to rescue the Company and should be replaced:

The internal culture at GM has reached a dead end. This vast company, once cited by Peter Drucker as the best-managed entity on the planet after the Roman Catholic Church, will not reverse course by cost-cutting, shutting down redundant capacity or re-enacting the tactics that have brought it to where it is today. At GM, the perennial turnaround prayer resides in next year's lineup of presumed hot -- but ultimately lukewarm -- new products. Yet the interests of shareholders, employees, suppliers, dealers, customers and, ultimately, the nation at large, point to the need for a real corporate makeover. The experience of 30 years strongly

suggests that it isn't going to come from the executives within GM
or from the culture that formed them.

## DEMAND FUTILITY ALLEGATIONS

42.    Plaintiff has not made any demand upon the current GM Board of Directors to

bring an action asserting the claims herein, for the damages suffered by GM, since such demand

would be futile, and is therefore excused.

43.    Demand is excused because the unlawful acts and practices alleged herein cannot

be defended by the Director Defendants and are not subject to the protection of any independent

business judgment. Because it would undoubtedly benefit GM to recover the damages caused by

these defendants' wrongdoing, and to assert these derivative claims, it would be an exercise in

futility to make a demand on the Directors.

44.    Demand is excused because the wrongs alleged herein constitute violations of the

fiduciary duties owed by GM's Board of Directors. The Director Defendants are subject to

liability for breaching their fiduciary duties to GM by, *inter alia*, failing to adequately monitor

GM's financial reporting, and to detect, prevent and/or halt the options manipulation and

accounting misstatements complained of herein.   Demand is also excused because the

overwhelming majority of the Director Defendants have ratified the egregious actions outlined

herein, and these same Director Defendants cannot be expected to prosecute claims against

themselves, and persons with whom they have extensive business and personal entanglements, if

Plaintiff demanded that they do so.

45.    Demand is also excused because the Director Defendants participated in,

approved and/or permitted the wrongs alleged herein, concealed or disguised those wrongs or

recklessly and/or negligently disregarded them, and are therefore not disinterested and lack

sufficient independence to exercise business judgment as set forth herein.

419870                                  14

46.    Demand is futile because the GM Board of Directors cannot be presumed to exercise independent judgment in assessing the merits of a demand, if one were made, due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint.  The GM Board of Directors would thus be required potentially to investigate and bring claims against themselves for their own misconduct, and subject themselves to liability, embarrassment and risk of adverse consequences from their other business engagements or interests.  No stockholder demand could or would prompt the GM Board of defendants to take action. As such, demand is excused.

47.    Demand is excused because insurance policies covering the liability of a company's officers and directors purport to exclude legal claims asserted directly by the company against such persons.  Thus, there was, and is, a substantial disincentive for GM to bring any action directly against the defendants.  Generally, under the terms of such directors' and officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of GM, including the defendants in this action, for misconduct and mismanagement.  Thus, if the policy or policies which GM maintains contain the foregoing provision, the insurance carriers would argue that GM and its Board of Directors are thereby contractually disabled from complying with any demand that would cause GM to institute, and/or prosecute any action against the defendants for such misconduct and mismanagement; because to do so could result in the loss to GM of its insurance coverage.  Similarly, GM would be disabled from pursuing the defendants as it would not benefit from any insurance they may have.

419870                                           15

48.    Demand would be futile for the following additional reasons.    Director Defendants Kresa, Laskawy, and Pfeiffer serve as members of the audit committee.    In this capacity, they are directly implicated in the breaches of the duty of care and oversight associated with GM's necessity to restate net income from continuing operations.

49.    Director Defendant O'Neal is the Chairman and CEO of Merrill Lynch & Co., Inc.    Merrill Lynch garners enormous fees from performing underwritings and investment banking services to GM.

50.    Moreover, GM's proxy filed on Form 14A with the SEC, states that four employees of GM who received more than $60,000 in annual compensation are members of the immediate family of a director or an executive officer.    The proxy, however, does not disclose the names of the employees or the directors/officers.

51.    Mr. Wagoner received compensation in the aggregate in 2004 of over $4.7 million in addition to the grant of 400,000 options to buy GM stock.

52.    Members of the Company's Investment Funds Committee of the Board are Cordina, Kresa, Kullman, Laskawy, O'Neal, and Pfeiffer. This Committee is charged to serve as the named fiduciary of GM and a number of its subsidiaries benefit plans governed by ERISA. GM's pension funds, however, are severely under funded and the subject of investigation. Indeed, the funds' actuary Watson Wyatt & Company Holdings recently disclosed that it had received a subpoena from the SEC concerning GM's pension accounting and that SEC's previously accounted informal investigation had been elevated to a formal investigation.  Watson Wyatt said that it had provided the documents and the subpoena also called for Watson Wyatt's employees' testimony.    Accordingly, members of this Committee are likely to be under investigation concerning the management of GM's pension funds – by some accounts under

funded by $25 billion in 2003 – requiring GM to float $17.6 million in bonds bringing long term debt to $300 billion.   GM is still left with a $50 billion deficit in its health care fund. Accordingly, demand on these directors – directly implicated in GM's pension funding fiasco – would be futile.

## COUNT I

### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

53.     Plaintiff incorporates by reference all paragraphs above as if set forth herein.

54.     Defendants all owed a fiduciary duties of loyalty and good faith to GM and its stockholders, including the duty to exercise due care and diligence in the management and administration of the affairs of the Company, as well as in the financial accounting, auditing and reporting of the Company, and owed the duty of full and candid disclosure of all material facts thereto.

55.     As fiduciaries, to discharge these duties, the defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of GM.

56.     The defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, GM to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and even greater damage in the future, including damage to GM's reputation, business and good will.

57.     GM has been directly and substantially injured by reason of the defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder and representative of GM, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT II

### DERIVATIVE CLAIM FOR CONTRIBUTION AND INDEMNIFICATION
#### (Against All Defendants)

58.   Plaintiff incorporates by reference all paragraphs above as if set forth herein.

59.   GM is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the defendants' liability to GM.

60.   In addition, the defendants' misconduct and wrongdoing, and the disclosures and events described herein, have had, and will continue to have, a series of deleterious effects on GM, including but not limited to:

(a)   Loss of confidence of the investing public in the integrity and management of GM, thereby resulting in GM losing market value.

(b)   As a result of the defendants' misconduct, GM is now exposed to SEC scrutiny and inquiry, and to suit by investors for losses resulting from their misconduct and fraudulent activities, thereby, at a minimum, causing the Company to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against GM.

61.   By reason of the accounting misstatements and other related misconduct described herein, GM's alleged liability arises, in whole or in part, from the intentional, knowing, reckless, disloyal and bad faith acts or omissions of the defendants as previously alleged herein.

62.   GM is therefore entitled to contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against GM by virtue of defendants' misconduct and wrongdoing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf, and derivatively on behalf of GM, prays for judgment as follows:

A.    As to Count I, Breach of Fiduciary Duty, against all the defendants:

(1) an award of monetary damages to Plaintiff, on behalf of GM, against all of the defendants, for all losses and/or damages suffered by GM as a result of the wrongdoings complained of herein, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial.

B.    As to Count II, Contribution and Indemnification, against all the defendants:

(1) contribution and indemnification from each of the defendants in connection with all such claims that have been, are or may in the future be asserted against GM by virtue of defendants' misconduct and wrongdoing alleged herein.

C.    Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.    Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated: November 10, 2005

MILLER SHEA, P.C.

By: _____
E. Powell Miller (P39487)
Marc L. Newman (P51393)
950 W. University Drive, Suite 300
Rochester, Michigan 48307
Telephone: 248-841-2200
Facsimile: 248-652-2852

419870

**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
Gregory M. Nespole, Esq.
Thomas H. Burt, Esq.
270 Madison Avenue, 11th Floor
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF MARC S. HENZEL**
Marc S. Henzel, Esq.
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

## VERIFICATION

I, Albert Stein declare that I have reviewed the Complaint ("Complaint"), and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

11-10-05
Date

_Albert Stein_
ALBERT STEIN

JS 44
(REV. 3/99)

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: Wayne County, MI

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
ALBERT STEIN

**DEFENDANTS**
ERSKINE B. BOWLES, at el.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __Montgomery, PA__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED __Wayne County, MI__
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(C)** ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)
**E. Powell Miller (39487)**
**Miller and Shea, P.C.**
**950 West University Drive; Suite 300**
**Rochester, MI 48307     (248) 841-2200**

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [x] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR
(For Diversity Cases Only)     AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— | [ ] 620 Other Food & Drug | | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related Seizure | [ ] 423 Withdrawal | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury— | of Property 21 USC 881 | 28 USC 157 | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | [ ] 630 Liquor Laws | | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 640 R.R. & Truck | **PROPERTY RIGHTS** | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product Liability | [ ] 650 Airline Regs. | [ ] 820 Copyrights | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | | [ ] 660 Occupational | [ ] 830 Patent | [ ] 810 Selective Service |
| Student Loans | [ ] 340 Marine | **PERSONAL PROPERTY** | Safety/Health | [ ] 840 Trademark | [ ] 850 Securities/Commodities/ |
| (Excl. Veterans) | [ ] 345 Marine Product | [ ] 370 Other Fraud | [ ] 690 Other | | Exchange |
| [ ] 153 Recovery of Overpayment | Liability | [ ] 371 Truth in Lending | | | [ ] 875 Customer Challenge |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| [x] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | Property Damage | [ ] 710 Fair Labor Standards | [ ] 861 HIA (1395ff) | [ ] 891 Agricultural Acts |
| [ ] 190 Other Contract | Product Liability | [ ] 385 Property Damage | Act | [ ] 862 Black Lung (923) | [ ] 892 Economic Stabilization Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | Product Liability | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DWC/DIWW | [ ] 893 Environmental Matters |
| | | | | [ ] 864 SSID Title XVI | [ ] 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 730 Labor/Mgmt. Reporting | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of |
| | | | & Disclosure Act | | Information Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate | | **FEDERAL TAX** | [ ] 900 Appeal of Fee Determination |
| | | Sentence | [ ] 740 Railway Labor Act | **SUITS** | Under Equal Access to Justice |
| [ ] 220 Foreclosure | [ ] 442 Employment | **HABEAS CORPUS** | | | [ ] 950 Constitutionality of |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ | [ ] 530 General | [ ] 790 Other Labor Litigation | [ ] 870 Taxes (U.S. Plaintiff | State Statutes |
| [ ] 240 Torts to Land | Accommodations | [ ] 535 Death Penalty | | or Defendant | [ ] 890 Other Statutory Actions |
| [ ] 245 Tort Product Liability | [ ] 444 Welfare | [ ] 540 Mandamus & Other | [ ] 791 Empl. Ret. Inc. | [ ] 871 IRS — Third Party | |
| [ ] 290 All Other Real Property | [ ] 440 Other Civil Rights | [ ] 550 Civil Rights | Security Act | 26 USC 7609 | |
| | | [ ] 555 Prison Condition | | | |

## V. ORGIN (PLACE AN "X" IN ONE BOX ONLY)

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUES UNLESS DIVERSITY)

28 U.S.C. §1332(a)

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] YES [ ] NO

## VIII. RELATED CASE(S) (See Instructions):
IF ANY

JUDGE _____  DOCKET NUMBER _____

DATE 11/10/05     SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.  Is this case that has been previously discontinued or dismissed?  ☐ YES  ■ NO

If **yes**, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.  Other than stated above, are there any pending or previously discontinued
or dismissed companion cases in this or any other court, including state court?
(Companion caes are matters in which it appears substnatially similar evidence
will be offered or the same or reltated parties are present and the cases arise out
of the same transaction or occurrence.)  ☐ YES  ■ NO

If **yes**, give the following information:

Court: _____

Case No.: _____

Judge: _____